UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH S. ROETTER and
DIANE K. ROETTER,

    Plaintiffs,

v.                                                   CASE NO. 1:09-CV-619

MICHIGAN DEPARTMENT OF         HON. ROBERT HOLMES BELL
CORRECTIONS,

    Defendant.
_____/

**OPINION**

On July 7, 2009, Plaintiffs Joseph S. and Diane K. Roetter filed a complaint alleging claims for violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., violation of the Michigan Persons with Disabilities Civil Rights Act (PDCRA), Mich. Comp. Laws § 37.1101, and loss of consortium against Plaintiff Joseph S. Roetter's former employer, Defendant Michigan Department of Corrections. Plaintiffs amended their complaint on August 25, 2009, to replace the ADA claim with a claim under the Rehabilitation Act, 29 U.S.C. § 794 et seq. (Dkt. No. 9.) This matter is before the Court on Defendant's motion for summary judgment on all of Plaintiffs' claims. (Dkt. No. 12.) For the reasons that follow, Defendant's motion will be granted.

## I. Factual Background

Defendant first hired Plaintiff[1] in 1989 to work at the Brooks Correctional Facility in Muskegon, Michigan, as a food service supervisor. As food service supervisor, Plaintiff was required to monitor inmates as they prepared meals for the larger prison population, ensure kitchen utensils were being used by the inmates in a safe and appropriate manner, and generally account for the safety, security, and sanitation of the kitchen area while the inmates worked. Plaintiff was usually the sole correctional facility employee overseeing food production at any given time, and he was responsible for supervising approximately fifteen to twenty inmates a day.

In 2000, Plaintiff was cited and suspended for inattention to duty after he was found sleeping in his office while inmates were working in the kitchen. Plaintiff was cited and reprimanded for a similar occurrence in 2002, though Plaintiff denied that he was sleeping on this occasion. On January 27, 2005, correctional facility employees observed Plaintiff dosing off as he monitored the breakfast line. As part of a disciplinary conference arising out of this incident, Plaintiff was shown a security video of himself confirming what the other employees had observed. Plaintiff was given a one-day suspension. This occasion prompted Plaintiff to seek a medical consultation in April of 2005. Plaintiff visited Doctor Lee C. Marmion, who conducted sleep studies on Plaintiff and determined that he suffered from narcolepsy. Dr. Marmion prescribed Plaintiff a drug called Provigil to combat his

---

[1] Unless otherwise indicated, references to "Plaintiff" herein refer to Plaintiff Joseph S. Roetter.

condition. In addition, Plaintiff asked Defendant to assign him permanently to the third shift rather than rotate him among various shifts because he believed he slept better during the day and would come to work more rested. Defendant granted this request.

On July 11, 2005, both Plaintiff and his supervisor noted that his attentiveness had improved. (Dkt. No. 13, Ex. 10.) Nevertheless, Plaintiff continued to suffer from narcoleptic episodes. On April 24, 2006, Plaintiff was again cited and suspended for inattention to duty after he was found sleeping in the kitchen. On December 27, 2006, inmates were involved in horseplay in the kitchen. An investigation revealed that the inmates were intoxicated, and that they had likely created the alcohol themselves by hiding fruits and vegetables somewhere in the facility and allowing them to ferment. As the supervisor on duty, Plaintiff was held responsible for the actions of the inmates, and was given a four day suspension. On April 6, 2007, Plaintiff was again found sleeping in the kitchen, and was given a five day suspension. On July 14, 2007, Plaintiff was standing near the breakfast line when one of the inmates discovered that the milk was spoiled and needed to be replaced. The inmate attempted to communicate the problem, but Plaintiff did not respond because he was leaning against a wall of the kitchen drifting in and out of sleep.

Following the July 14, 2007, incident, and as a result of all the disciplinary measures taken against Plaintiff, Plaintiff was discharged on November 5, 2007. Plaintiff originally brought suit for disability discrimination under the Michigan Persons with Disabilities Civil Rights Act (PDCRA) and the Americans with Disabilities Act (ADA) on July 7, 2009, but

3

Plaintiff amended his complaint on August 25, 2009, to replace the ADA claim with a Rehabilitation Act claim. Plaintiff's wife, Diane K. Roetter, brings a claim for loss of consortium. Defendant filed this motion for summary judgment on all claims on September 25, 2009.

**II. Law and Analysis**

"The Rehabilitation Act, not the Americans with Disabilities Act, constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007) (citing 42 U.S.C. § 12111(5)(B)(i)). Nevertheless, in the Sixth Circuit, ADA claims and Rehabilitation Act claims "share the same substantive standards." *Id.* (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)). In addition, "[c]laims of handicap discrimination under Michigan law [including claims under the PDCRA] essentially track those under federal law." *Monette*, 90 F.3d at 1178 n.3.

Plaintiffs may attempt to prove unlawful discrimination by either presenting direct evidence of discrimination, or by presenting indirect evidence of discrimination, and by shifting the burden to the employer to articulate a non-discriminatory reason for the discharge. *Monette*, 90 F.3d at 1178, 1186-87. If an employee attempts to prove a violation of the Rehabilitation Act through reliance on direct evidence of discrimination:

> 1) The plaintiff bears the burden of establishing that he or she is "disabled."
> 2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her

disability: a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.

3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Monette*, 90 F.3d at 1186.

If, on the other hand, an employee has no direct evidence of discrimination, but seeks to prove a Rehabilitation Act violation through indirect and circumstantial evidence, the three-step burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). First, the employee must make a prima facie showing of indirect discrimination. The prima facie case requires the employee to prove by a preponderance of the evidence: 1) that he or she is disabled; 2) that he or she is otherwise qualified for the position; 3) that he or she suffered an adverse employment decision; 4) that the employer knew or had reason to know of the employee's disability; and 5) that the position remained open while the employer sought other applicants or the disabled individual was replaced. *Id.*; *see also Monette*, 90 F.3d at 1186. After the employee proves a prima facie case of disability discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory justification for the adverse employment action. *Jones*, 488 F.3d at 404. If the employer is able to articulate a legitimate justification for the discharge, the burden shifts back to the employee to demonstrate that the explanation is pretextual. *Id.*

5

The parties have conducted only limited discovery in this matter. Thus, Plaintiff does not yet know whether he will attempt to prove his case using direct evidence or indirect evidence. However, regardless of whether Plaintiff will rely on direct or indirect evidence, Plaintiff will be required to show that, with or without reasonable accommodation, he is qualified to perform the essential functions of his job description despite his discharge.[2] Defendant is entitled to summary judgment if the pleadings, affidavits, and other discovery materials show that there is no genuine issue as to any material fact and that Defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Because, even at this early stage, the record is clear that Plaintiff is not "otherwise qualified" to perform the essential functions of his position, with or without reasonable accommodation, Defendant is entitled to summary judgment.

There is no question that attentiveness is an essential part of Plaintiff's job description. As food service supervisor, Plaintiff was responsible for supervising fifteen to twenty inmates throughout the course of a night. (Dkt. No. 16, Ex. 1 ¶ 7.) The inmates had the potential to, and occasionally did, become unruly. (*Id.* at ¶ 8.) In the kitchen, inmates were given potentially dangerous tools and other common dining and food preparation utensils. The threat to security posed by an inattentive supervisor is obvious.

Plaintiff first seems to argue that, even without additional accommodation, he is

---

[2]As noted above, Plaintiff can also demonstrate a violation of the Rehabilitation Act using direct evidence by showing that he is "otherwise qualified" for his position with an alleged "essential" job requirement eliminated. However, Plaintiff does not allege that any of his claimed "essential" job requirements are not, in fact, essential.

capable of remaining attentive, and that any bouts of inattentiveness he may have experienced were not sufficiently egregious to warrant his dismissal. For example, Plaintiff argues that he should not have been suspended for the events that occurred on December 27, 2006, when inmates were found to be intoxicated on his watch, because he did not do anything wrong. In addition, Plaintiff argues that he should not have been suspended for falling asleep on April 6, 2007, because "the incident was caused by an honest mistake" in connection with an adjustment that Plaintiff made to his sleep schedule during the previous week while Plaintiff was on vacation. (Dkt. No. 16 Pl.'s Br. 8.) Plaintiff further admits that "[t]here have been a few occasions, however, in which his condition for a few minutes rendered him inattentive to his duties," but claims that these "one or two occasions a year" do not give Defendant sufficient grounds for termination. (*Id.* at 1, 15.) These "one or two occasions a year" include Plaintiff sleeping in the kitchen on April 24, 2006, and the incident on July 14, 2007, when Plaintiff failed to respond to an inmate's request to change the milk dispenser because he had fallen asleep. Even assuming the Court should not consider the December 27, 2006, and April 6, 2007, incidences, it is clear to the Court that the remaining incidences are alone sufficient to suggest that Plaintiff is not capable of performing the essential functions of his job without additional accommodation. Even if Plaintiff only becomes unresponsive a few times a year, an unresponsive supervisor poses a serious threat to the operation and safety of the correctional facility. Prison officials were justified in losing confidence in Plaintiff's ability to do his job as a result of these events. Likely

aggravating the significance of these events to Defendant is the fact that Plaintiff often worked alone, meaning that there could have been other instances of Plaintiff's inattention that no correctional facility employee ever discovered.

Thus, the Court is left to decide whether, with reasonable accommodation, Plaintiff would have been able to remain attentive while working. Plaintiff claims that, to accommodate his disability, Defendant should have created a requirement, applicable to all correctional facilities employees, that employees that discover Plaintiff sleeping should shake him and shout at him until he awakens (the "shake and shout technique"), and that this accommodation would have enabled Plaintiff to perform the essential duties of his occupation. First, Plaintiff never suggested this accommodation to Defendant. Plaintiff raises it only in response to Defendant's motion for summary judgment. Although an employer and an employee are required to engage in an interactive dialogue to determine whether reasonable accommodations exist, the employee bears the initial burden of starting the dialogue by proposing a reasonable accommodation. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007). After Defendant transferred Plaintiff to third shift, his narcoleptic episodes did not cease, yet there is no evidence that Plaintiff suggested to Defendant that any further accommodations be made.

Even if the Court were to conclude that Defendant was charged with a unilateral obligation to identify and suggest possible accommodations, the shake and shout technique, though possibly "reasonable" and simple to implement, would not have significantly

mitigated the negative effects of Plaintiffs disability on Plaintiff's ability to remain attentive while supervising. In Plaintiff's affidavit he admits that, as food supervisor, the majority of his work he performed alone, without the company of other correctional facilities employees. (Dkt. No. 16, Ex. 1 ¶ 76 ("In my job as food service supervisor, I spent a significant time alone with the inmates that I supervised.")) The shake and shout technique would only be effective to accommodate Plaintiff's disability if other correctional facility employees were present to use the technique when Plaintiff's narcolepsy symptoms began to manifest.[3] Without the company of other employees, nothing would prevent Plaintiff from dosing off while supervising, even with the shake and shout policy in place.

The Court recognizes that the shake and shout technique may be effective to mitigate the negative effects of Plaintiff's disability if he is transferred to a position that requires him to work with other employees rather than alone. If other employees work alongside Plaintiff, they may be able to monitor Plaintiff's drowsiness levels and alert him if he ever began to dose off. However, this "accommodation" actually requires two accommodations: 1) implementation of the shake and shout technique, and 2) the transfer of Plaintiff to a position that requires him to be near other employees at all times. *See Kleiber*, 485 F.3d at 870 n.3 ("[I]t is permissible for an employee to request another job (itself an accommodation) that she can perform with an (additional) accommodation."). Plaintiff cannot rely on transfer to

---

[3]The Court does not presume that Plaintiff is arguing that a correctional facility employee should have been assigned to "shadow" and monitor him at all times. Such an accommodation would be patently unreasonable.

another position as an accommodation supporting his Rehabilitation Act claim because he never asked to be transferred to another position. It is true that an employer must consider transferring an employee to an alternative position that will reasonably accommodate the employee's disability, if such a position exists, *see* 42 U.S.C. § 12111(9)(B), but this obligation is triggered only after the employee first expresses interest in a transfer or proposes the idea to the employer. *See Kleiber*, 485 F.3d at 870 ("Generally, an ADA plaintiff 'bears the burden of proposing an accommodation and showing that that accommodation is objectively reasonable.' . . . [T]o overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004)). Even in Plaintiff's brief he does not suggest that a transfer to another position would have been possible, appropriate, or desirable, and there is no indication that he requested a transfer prior to his termination. Plaintiff argues only that Defendant should have implemented the shake and shout technique, which, as discussed above, would have been insufficient in itself to prevent Defendant from dosing off on the days he was working alone.

### III. Conclusion

Regardless of whether Plaintiff has direct evidence of disability discrimination or has no such evidence, Plaintiff's Rehabilitation Act and Michigan PDCRA claims require him to show that he is "otherwise qualified" to perform the essential functions of his position, with or without reasonable accommodation. Without reasonable accommodation, Plaintiff

is not capable of remaining sufficiently attentive to his work to ensure the safety and proper supervision of the food service division of the Muskegon Correctional facility. Implementation of the shake and shout technique alone would not have been a sufficient accommodation to allow Plaintiff to remain attentive to his position. In addition, although implementation of a shake and shout technique combined with the reassignment of Plaintiff to another position may have be a sufficient accommodation to allow him to remain attentive to his position, Plaintiff has never proposed or expressed interest in a reassignment. Because Plaintiff has not demonstrated that he is capable of performing the essential functions of his job with or without reasonable accommodation, his PDCRA and Rehabilitation Act claims fail. Plaintiff's wife's claim for loss of consortium fails as well because it is entirely dependant on the success of Plaintiff's claims. *See Monette*, 90 F.3d at 1176 n.1.

An order and judgment consistent with this opinion shall be entered.


Dated: July 12, 2010                      /s/ Robert Holmes Bell
                                                                   ROBERT HOLMES BELL
                                                                   UNITED STATES DISTRICT JUDGE